**THE CITY OF NEW YORK and the New York City Department of Finance, Plaintiffs,**

v.

**FEDERAL DEPOSIT INSURANCE CORPORATION, as receiver for Freedom National Bank, Goldome Federal Savings Bank, American Savings Bank, and First New York Bank for Business, Defendant.**

Nos. 97 Civ. 6351(DC), 97 Civ. 6878(DC), 97 Civ. 6879(DC), 97 Civ. 6880(DC).

United States District Court, S.D. New York.

March 10, 1999.

Michael D. Hess, Corporation Counsel of the City of New York by Frances J. Henn, David M. Steiner, New York City, for plaintiffs.

Nixon, Hargrave, Devans & Doyle LLP by Ealy A. Bennett, Carolyn G. Nussbaum, Constance M. Boland, Melynda G. Broomfield, New York City, for defendant.

## MEMORANDUM DECISION

CHIN, District Judge.

In these four related cases, plaintiffs the City of New York and the New York City Department of Finance (together, the "City") challenge the disallowance of their claims for taxes allegedly owed by the Federal Deposit Insurance Company (the "FDIC"), as receiver for four failed banks—Freedom National Bank ("Freedom"), Goldome Federal Savings Bank ("Goldome"), American Savings Bank ("American"), and First New York Bank For Business ("First New York"). The City contends that it is owed more than $82 million from the FDIC in unpaid taxes, interest, and penalties. The FDIC moves in each case to dismiss for lack of subject matter jurisdiction. For the reasons set forth below, the motions are granted and the complaints are dismissed.

## BACKGROUND

### A. Statutory Scheme

■ The Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA") was enacted by Congress in 1989. It sets forth the powers of the FDIC as receiver to wind up the affairs of a failed financial institution. FIRREA was intended to provide " 'a detailed regulatory framework so as to restore the financial integrity of the thrift industry's deposit insurance fund and to ... "deal expeditiously with failed depository institutions." ' " *Betancourt v. FDIC*, 851 F.Supp. 126, 129 (S.D.N.Y.1994) (quoting

*Circle Indus. Div. of Nastasi–White, Inc. v. City Fed. Savings Bank*, 749 F.Supp. 447, 451 (E.D.N.Y.1990), *aff'd*, 931 F.2d 7 (2d Cir.1991) (citing P.L. 101–73, 103 Stat. 183, § 101[8] )).

Essentially, FIRREA grants the FDIC "broad powers in its capacity as receiver" to decide claims against a failed financial institution. *Id.* It sets forth a "comprehensive administrative claim process, adherence to which is a prerequisite to judicial review." *Id.* As discussed in greater detail below, any creditor with a claim against a failed financial institution is required to file a proof of claim with the FDIC by a certain date, the "bar date." In addition, creditors whose claims are disallowed must seek administrative or judicial review within certain time periods.

### B. The Facts [1]

#### 1. Freedom (No. 97 Civ. 6351)

On November 9, 1990, the Comptroller of the Currency declared Freedom insolvent, closed the bank, and appointed the FDIC as its receiver. The FDIC published more than one notice of Freedom's closing in several newspapers pursuant to § 1821(d)(3)(B) of FIRREA. As set forth in these notices, the bar date for filing proofs of claim against Freedom was February 22, 1991.

On or about November 10, 1990, the FDIC mailed the City (Department of Finance) a letter entitled "Notice of Financial Institution Closing and Request for Tax Information." On or about November 15, 1990, the FDIC mailed the City (Finance Administrator) a "Notice to Creditors" letter. The November 10th letter advised the City it had to file a proof of claim within ninety days and the November 15th letter advised the City it had to file a proof of claim by February 22, 1991.

1. The City did not file a Local Rule 56.1 Statement with its opposition papers. (*See* Letter to Court dated June 30, 1998). In accordance with the Local Rules, therefore, the material facts set forth in each of the FDIC's 56.1 Statements are deemed admitted. The material facts do not appear to be disputed, in any event.

The City received both letters [2] but did not file a proof of claim with the FDIC on or before February 22, 1991.

On or about July 15, 1991, the FDIC again mailed a letter to the City (Department of Finance) notifying it of Freedom's closing and enclosing a copy of Freedom's Commercial Rent Tax ("CRT") return.[3] The letter again notified the City that it had to file a claim within ninety days of receipt to be considered. On or about August 15, 1991, the FDIC mailed another "Notice to Creditors" letter to the City (Department of Finance), notifying the City of Freedom's closing and informing the City that a proof of claim had to be filed. The August 15th letter did not set a deadline for filing a proof of claim. Again, the City received both letters.

Arguably, these additional letters set new bar dates. The City did not, however, file a proof of claim with the FDIC within 90 days of its receipt of the July 15th or August 15th letter. Rather, the City did not file a proof of claim with the FDIC for almost five years—until July 2, 1996. At that time, the City filed a proof of claim for $26,944.98, representing $3,857 in CRT for June 1, 1990 to November 9, 1990, $11,157.40 in Bank Tax[4] for January 1, 1989 to November 9, 1990, and $11,930.58 in penalties and interest. Because the FDIC did not act on the claim within 180 days after it was filed, the proof of claim was "deemed denied."[5] (Shea Freedom Aff. ¶ 13).

### 2. Goldome (No. 97 Civ. 6878)

On May 31, 1991, the New York State Superintendent of Banks declared Goldome insolvent, closed the bank, and appointed the FDIC as its receiver. The FDIC published more than one notice of Goldome's closing in several newspapers pursuant to § 1821(d)(3)(B) of FIRREA. As set forth in these published notices, the bar date for filing proofs of claim against Goldome was September 13, 1991.

On or about May 31, 1991 the FDIC mailed the City (Water Board) a copy of the notice of Goldome's closing. The May 31st transmittal letter advised that the bar date was September 13, 1991. On or about June 3, 1991, the FDIC mailed the City (Department of Finance) a letter entitled "Notice of Financial Institution Closing and Request for Tax Information." The June 3d letter advised the City that it had to submit a proof of claim within ninety days. On or about June 6, 1991, the FDIC mailed another letter entitled "Notice to Creditors" to the City (Department of Finance). The City received all three letters. The City did not file a proof of claim with the FDIC within ninety days of any of these letters or before the September 13, 1991 bar date.

On November 26, 1996, some five years later, the City sent the FDIC a notice of proposed Bank Tax due against Goldome in the amount of $114,224.02 for the period January 1, 1991 to May 31, 1991. In response to the City's November 26, 1996 notice, "and pursuant to the policy that the

2. In its opposition, the City repeatedly contends that the FDIC failed to notify specifically the Department of Finance's Bank Tax Unit of the FDIC's receivership. (*See* City Mem. at 3, 7, 9; Frankel Freedom Aff. ¶ 2; Frankel Goldome Aff. ¶ 2; Frankel American Aff. ¶ 2). The City fails to demonstrate, however, that the FDIC was required to send a separate notice to that or any other unit of the City's Department of Finance.

3. New York City imposes a CRT in an amount equal to a certain percentage of the basic rent paid by commercial tenants of property in Manhattan south of 96th Street. The taxable

year for the calculation of CRT is June 1 through May 31. CRT is collected by New York City's Department of Finance. (*See* FDIC Mem. at 4–5).

4. New York City imposes a banking corporation tax ("Bank Tax") on every banking corporation doing business in New York City. (*See* FDIC Mem. at 5).

5. Apparently, the City filed this proof of claim again on or about September 6, 1996. (*See* Shea Freedom Aff. Ex. 32 (proof of claim dated 9/6/96 with the 7/2/96 claim attached)).

FDIC–Receiver seeks to review every potential claim," on December 19, 1996, the FDIC forwarded a "Notice to File Late Claim" to the City, enclosing a proof of claim form. (FDIC Mem. at 11 and Shea Goldome Aff. Ex. 20; *see also* FDIC Mem. at 7 n. 3 and Shea First New York Aff. ¶¶ 9, 14 (explaining that it is the FDIC's practice to consider the merits of claims even if they are untimely, but that the FDIC does not concede timeliness of a claim merely because it considers the claim)). The FDIC notice stated *inter alia* that "[u]nder applicable law, the Receiver must disallow claims which are not filed by the bar date, *except* the Receiver may consider a claim filed after the bar date if it is shown that the claimant did not receive notice of the appointment of the Receiver in time to file such claim before the bar date, and such claim is filed in time to permit payment of the claim." (Shea Goldome Aff. Ex. 20 (emphasis in original)).

On March 6, 1997, the City filed a proof of claim with the FDIC seeking $2,319,577.00 in Bank Tax allegedly due for the fiscal year ending May 31, 1991, and $2,233,869.60 in interest and penalties. (*Id.* Ex. 21). In a letter dated July 17, 1997, the FDIC disallowed the claim as untimely pursuant to 12 U.S.C. § 1821(d)(5)(C). (*Id.* Ex. 22).

### 3. *American (No. 97 Civ. 6879)*

On June 12, 1992, the New York State Superintendent of Banks declared American insolvent, closed the bank, and appointed the FDIC as its receiver. The FDIC published more than one notice of American's closing in several newspapers pursuant to § 1821(d)(3)(B) of FIRREA. As set forth in these published notices, the bar date for filing proofs of claim against American was September 18, 1992.

On or about June 12, 1992, the FDIC mailed the City two letters entitled "Notice of Financial Institution Closing and Request for Tax Information." One letter was addressed to the Bureau of Tax Operations at the Department of Finance. The other was addressed to the CRT Taxpayer Correspondence Unit at the Department of Finance. Both letters advised the City that a proof of claim "should" be submitted within ninety days. The City received one or both of these letters.[6]

On or about August 14, 1992, the FDIC mailed a copy of American's CRT return to the City. The City filed a *timely* proof of claim with the FDIC on September 15, 1992 for unpaid CRT for June 1–12, 1992 of $7,330 and unpaid Bank Tax for January 1, 1989 through December 31, 1991 of $200,000 with interest of $60,000 for a total of $267,330. (Shea American Aff. ¶ 7 and Ex. 38). The City did not file a proof of claim for Bank Tax for the period January 1, 1992 through June 12, 1992, or any part thereof.

On or about December 13, 1993, the FDIC mailed the City two letters informing it that the FDIC was only partially allowing the City's claim for American's purported unpaid taxes. (*Id.* Ex. 39). The letters informed the City that if it wished to challenge the partial disallowance, it had to do so within sixty days by commencing suit in the appropriate district court. (*Id.*). The City received both letters, but did not challenge the partial disallowance within sixty days.

On December 4, 1996, some three years later, the City notified the FDIC of proposed Bank Tax due for 1992, claiming that American owed a total of $14,453,064.21, representing $8,425,973.94 in Bank Tax, $3,077,999.39 in interest, and $2,949,090.88 in penalties. (*Id.* Ex. 40). This was the first time the City assessed Bank

---

6. The City contends that it "has no record" of receiving the FDIC's June 12, 1992 letter. The contention is of no moment. First, the fact that the City has "no record" of receiving the letter does not mean that the City did not

receive it. Second, the City does not dispute that it received as least one of the letters. (*See* American 56.1 Statement ¶ 5; *see also* Boland Dec. Ex. N).

Tax for 1992. Pursuant to its policy of reviewing all potential claims and in response to the City's December 4, 1996 notice, the FDIC sent the City a letter entitled "Notice to File Late Claim," informing the City that claims filed after the bar date would be disallowed, "*except* the Receiver may consider a claim filed after the bar date if it is shown that the claimant did not receive notice of the appointment of the Receiver in time to file such claim before the bar date, and such claim is filed in time to permit payment of the claim." (*Id.* Ex. 41 (emphasis in original)).

On or about March 12, 1997, the City filed a proof of claim with the FDIC seeking $14,461,549.56, representing Bank Tax, interest and penalties for the period from January 1, 1992 to June 12, 1992. (*Id.* Ex. 42). In a letter dated July 17, 1997, the FDIC disallowed the claim as untimely pursuant to 12 U.S.C. § 1821(d)(5)(C). (*Id.* Ex. 43).

### 4. *First New York (No. 97 Civ. 6880)*

On November 13, 1992, the New York State Superintendent of Banks declared First New York insolvent, closed the bank, and appointed the FDIC as its receiver. The FDIC published more than one notice of First New York's closing in several newspapers pursuant to § 1821(d)(3)(B) of FIRREA. As set forth in these published notices, the bar date for filing proofs of claim against First New York was February 22, 1993.

On November 13, 1992, the FDIC mailed the City two letters entitled "Notice of Financial Institution Closing and Request for Tax Information." One was addressed to the CRT Unit and the other to the Bureau of Tax Operations of the Department of Finance; both advised the City that proofs of claim "should" be submitted within ninety days.

On or about November 19, 1992, the FDIC mailed the City (Department of Finance) a letter entitled "Notice to Creditors" and advising the City of the February 22, 1993 bar date. On or about November 30, 1992, the FDIC mailed the City (CRT Unit of the Department of Finance) a copy of First New York's CRT return, which showed tax due of $20,469. The FDIC did not remit the taxes at that time, but advised the City that it had to submit a proof of claim within ninety days. The City received all three letters and First New York's CRT return, but failed to file a proof of claim on or before the February 22, 1993 bar date or within ninety days of any of the letters.

On May 11, 1993, the City filed a proof of claim with the FDIC for $170,500.00 against First New York—$65,000 in CRT for June 1, 1989 to November 13, 1992, $90,000 in Bank Tax for January 1, 1989 to November 13, 1992, and $15,500 in interest. (Shea First New York Aff. Ex. 7). On November 16, 1993, the FDIC mailed a letter to the City requesting additional information from the City to process its claim. (*Id.* Ex. 8). On February 9, 1994, the FDIC sent the City a letter indicating that the FDIC had disallowed the City's May 11, 1993 proof of claim. (*Id.* Ex. 9). The letter advised the City that if it wished to contest the determination, it had to file suit in the appropriate district court within sixty days. (*Id.*). The City did not do so.[7]

On December 13, 1996, the City mailed the FDIC a notice of tax due in the amount of $63,174,586.09, representing approximately $35.7 million in Bank Tax for January 1, 1992 to November 13, 1992, $14.4 million in interest, and $13 million in penalties. (*Id.* Ex. 10). In response to

---

7. The City had reasonable grounds to contest the disallowance. Indeed, the additional information requested by the FDIC was "[c]opies of contract(s) or binding agreement(s) between the claimant and the Bank." (Shea First New York Aff. Ex. 8). As the City points

out in opposition, the request appears to be "meant for vendors or other such creditors and ... has no application to a taxing authority." (City Mem. at 4). Nonetheless, the City failed to file suit and, therefore, the disallowance is final.

the City's December 13, 1996 notice of tax due, the FDIC mailed a letter to the City dated January 10, 1997, which informed the City *inter alia* that claims filed after the bar date would be disallowed *"except the Receiver may consider a claim filed after the bar date if it is shown that the claimant did not receive notice of the appointment of the receiver in time to file such claim before the bar date, and such claim is filed in time to permit payment of the claim." (Id.* Ex. 11 (emphasis in original)).

On March 25, 1997, the City filed a second proof of claim with the FDIC for $63,174,586.09 in allegedly unpaid taxes as itemized in its December 13, 1996 letter. (*Id.* Ex. 12). In a letter dated July 17, 1997, the FDIC disallowed the claim as untimely pursuant to 12 U.S.C. § 1821(d)(5)(C). (*Id.* Ex. 13).

## C.  *Prior Proceedings*

The City originally filed suit against the FDIC as receiver for Freedom in the United States District Court, District of Columbia on February 26, 1997. On July 24, 1997, the parties consented to transfer the case to this Court, whereupon it was assigned to me. On September 16, 1997, the City filed separate suits against the FDIC as receiver for Goldome, American, and First New York. Thereafter, the parties conducted limited discovery on the issue of the Court's subject matter jurisdiction over the cases. These motions followed.

## DISCUSSION

### A.  *Applicable Legal Standards*

#### 1.  *FIRREA*

##### a.  *Administrative Claims Process*

Once the FDIC is appointed receiver of a failed institution, the claims process begins with a directive that the FDIC "promptly publish a notice to . . . creditors to present their claims, together with

proof, to the receiver" by a specified date no less than ninety days from the date of publication. 12 U.S.C. § 1821(d)(3)(B). In addition to this generalized notice obligation, FIRREA also requires the FDIC to "mail a notice similar to the notice" described above to all known creditors of the institution at their last known address. 12 U.S.C. § 1821(d)(3)(C). The date by which claims must be filed is the "bar date."

If a claimant submits a claim after the date specified in the FDIC notice to creditors, § 1821(d)(5)(C)(i) mandates that the untimely claim "shall be disallowed and such disallowance shall be final." There is only one exception as to untimely claims. FIRREA permits the FDIC, as a *discretionary* matter, to review an untimely claim if the claimant establishes, to the FDIC's satisfaction: (1) that the claimant did not receive notice of the FDIC's appointment as receiver in time to file a claim; *and* (2) such claim is filed in time to permit payment of the claim. 12 U.S.C. § 1821(d)(5)(C)(ii).

Once a creditor submits a claim with the requisite documentation, the FDIC has 180 days to determine whether to allow or disallow the claim. 12 U.S.C. § 1821(d)(5)(A)(i). Upon disallowance, or in the event that the FDIC fails to make a determination within the 180-day period, claimants have the right to seek administrative review and an administrative hearing or judicial review in a district court, provided they do so within sixty days of either the disallowance or the end of the 180-day period, whichever is *earlier.* 12 U.S.C. § 1821(d)(6)(A).[8] If a claimant fails to seek review of a disallowance within the prescribed period, § 1821(d)(6)(B) directs that the claim be disallowed and that "such disallowance shall be final, and the claimant shall have no other rights and remedies with respect to such claim."

---

8.  A claimant may seek administrative review and an administrative hearing pursuant to § 1821(d)(7)(A). The City did not seek administrative review here. There is a limited right to judicial review following this administrative review.

### b. *Judicial Review*

■ Although *"de novo* judicial review is ... available to a diligent claimant, those who fail to adhere to the statute's requirements may forfeit their right to that procedure." *Betancourt,* 851 F.Supp. at 130; *see also Capital Data Corp. v. Capital Nat'l Bank,* 778 F.Supp. 669, 674 (S.D.N.Y.1991). Noncompliance with FIRREA's administrative procedure precludes a district court from reviewing the FDIC's determination of a claim. FIRREA explicitly provides that:

> Except as otherwise provided in this subsection, no court shall have jurisdiction over any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the [FDIC] has been appointed receiver, including assets which the [FDIC] may acquire from itself as such receiver; or any claim relating to any act or omission of such institution or the [FDIC] as receiver.

12 U.S.C. § 1821(d)(13)(D); *see also Resolution Trust Corp. v. Elman,* 949 F.2d 624, 627 (2d Cir.1991) ("a claimant must first present its case to the RTC under the administrative procedure erected by FIRREA before seeking relief in the federal courts") (citing *Circle Indus.,* 931 F.2d at 8); *Prieto v. Standard Fed. Sav. Bank,* 903 F.Supp. 670, 672 (S.D.N.Y.1995) ("[c]laimants who do not exhaust this administrative process cannot have their claims reviewed by a federal court"). Indeed, "it is clear that if the FDIC can show that there is no genuine issue of material fact as to *either* the FDIC's compliance [concerning notice] or [plaintiff's] non-compliance with the FIRREA procedures, summary judgment dismissing [plaintiff's] complaint for lack of subject matter jurisdiction should be granted." *Capital Data Corp.,* 778 F.Supp. at 674 (emphasis added).

■ Hence, as a prerequisite to suit, a creditor must (a) file a timely proof of claim with the FDIC and (b) seek judicial review on a timely basis from any adverse determination (or failure to act within 180 days). *See Betancourt,* 851 F.Supp. at 133 (granting summary judgment in FDIC's favor against defendants who "did not file a claim within the allowable time period"); *Laurenzano v. Crossland Sav. Bank,* 837 F.Supp. 514, 516 (E.D.N.Y.1993) (noting that FIRREA "treats the sixty-day period [in 12 U.S.C. § 1821(d)(6)(B) ] as a statute of limitations").

### 2. *Motions to Dismiss for Lack of Subject Matter Jurisdiction*

■ On a motion to dismiss for lack of subject matter jurisdiction, the court may resolve disputed jurisdictional factual issues by reference to evidence outside the pleadings. *Kamen v. American Telephone & Telegraph Co.,* 791 F.2d 1006, 1011 (2d Cir.1986); *see also Cauthorne v. Mutual Life Ins. Co. of New York,* No. 96 Civ. 0232, 1997 WL 154019, at *2 (S.D.N.Y. Apr. 1, 1997). The court may decide the matter on the basis of affidavits or other evidence, and "no presumptive truthfulness attaches to the complaint's jurisdictional allegations." *Guadagno v. Wallack Ader Levithan Assoc.,* 932 F.Supp. 94, 95 (S.D.N.Y.1996); *accord Integrated Utils. Inc. v. United States,* No. 96 Civ. 8983, 1997 WL 529007, at *3 (S.D.N.Y. Aug.26, 1997) (" 'argumentative inferences favorable to the party asserting jurisdiction should not be drawn' ") (quoting *Atlantic Mutual Ins. Co. v. Balfour Maclaine Int'l Ltd.,* 968 F.2d 196, 198 (2d Cir.1992)). The party asserting subject matter jurisdiction has the burden of proving, by a preponderance of the evidence, that the court has subject matter jurisdiction. *Malik v. Meissner,* 82 F.3d 560, 562 (2d Cir.1996); *Gallo v. United States,* 950 F.Supp. 1246, 1248 (S.D.N.Y.1997) (citing *Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 507 (2d Cir.1994)).

### B. *Application*

### 1. *The City's Failures*

■ The City has failed to meet its burden of proving that the Court has sub-

ject matter jurisdiction over its claims. Indeed, the undisputed facts demonstrate the following:

### a. *Freedom*

The City did not file a proof of claim with respect to Freedom until July 2, 1996, more than five years after the February 22, 1991 bar date. Even assuming the additional letters extended the bar date, the last letter was August 15, 1991 and thus the bar date was extended at best to November 15, 1991. Hence, the City did not file a timely proof of claim with respect to Freedom.

### b. *Goldome*

The City did not file a proof of claim with respect to Goldome until March 6, 1997, more than five years after the September 13, 1991 bar date. Even if the City's November 26, 1996 notice of proposed Bank Tax due is deemed a proof of claim, it was still more than five years late. Hence, the City did not file a timely proof of claim with respect to Goldome.

### c. *American*

The City did file a timely proof of claim, on September 15, 1992, with respect to $267,330 of taxes and interest allegedly owed by American for CRT from June 1–12, 1992 and for Bank Tax from January 1, 1989 through December 31, 1991. The FDIC allowed $7,330 for the CRT, but disallowed the balance for Bank Tax on December 13, 1993. The City did not seek judicial review within sixty days, as required. Hence, this claim for the 1989–1991 Bank Tax is barred.

On December 4, 1996, the City notified the FDIC of a claim for $14,453,064.21 in Bank Tax and interest allegedly owed with respect to American for the period January 1, 1992 to June 12, 1992 (when American was closed). The City filed a formal proof of claim for $14,461,549.96 on March 12, 1997. Whether the claim for 1992 Bank Tax is deemed filed as of December 4, 1996 or March 12, 1997, the claim was filed several years after the bar date and therefore it was untimely.

### d. *First New York*

The City did not file a proof of claim with respect to the First New York claim until May 11, 1993, two and a half months after the February 22, 1993 bar date and more than ninety days after any of the additional letter notices. Hence, the City did not file a timely proof of claim with respect to First New York. Moreover, the FDIC disallowed the May 11, 1993 First New York proof of claim on February 9, 1994. The City did not file suit within sixty days. Hence, the claim is barred on both grounds.

Instead, the City waited until December 13, 1996 to serve a notice of tax due and until March 25, 1997 to file a second proof of claim against First New York. Whether this second claim is deemed filed as of December 13, 1996 or March 25, 1997, the claim was filed several years after the bar date and therefore it was untimely. Nor could the notice of tax due or second proof of claim serve to resurrect the May 11, 1993 proof of claim.

### 2. *The City's Arguments*

Notwithstanding the undisputed facts, the City advances three principal arguments to support its contention that its failures to comply with FIRREA should be excused. First, the City contends that the Court should hear its claims because FIRREA's "dark and unwelcoming pathways" have stymied the City's diligent effort to collect money allegedly owed by Freedom, Goldome, American, and First New York. (*See* City Mem. at 16). Second, the City argues that the bar dates do not apply because the FDIC, by its conduct, essentially waived its right to deny claims based on untimeliness. Third, the City argues that the FDIC's tax liability did not accrue until the FDIC filed tax returns and that the City's claims therefore are post-receivership claims to which the bar dates at issue do not apply.

■ First, I reject the City's policy argument concerning FIRREA's "dark and unwelcoming pathways." The City cannot seriously argue that it should be excused from complying with FIRREA's jurisdictional requirements merely because they are complicated.

■ Second, I likewise reject the City's contention that its untimely claims should have been allowed because of the FDIC's conduct. It is true, as the City points out, that the FDIC often sent multiple notices, which sometimes caused confusion because they sometimes gave different bar dates. In addition, the FDIC sometimes solicited documentation on, and even discussed settlement of, claims that were later rejected as untimely. These facts, however, do not provide any basis for holding that the FDIC waived FIRREA's requirements or that the FDIC is somehow estopped from enforcing them. *See RTC Mortgage Trust 1994–N2 v. Haith,* 133 F.3d 574, 579 (8th Cir.1998) (" 'the RTC cannot, by its own conduct or otherwise, be estopped from raising the issue of subject matter jurisdiction' ") (quoting *Bueford v. RTC,* 991 F.2d 481, 485 (8th Cir.1993)). The multiple notices, the requests for information, and the settlement discussions did not prejudice the City in any way nor did they excuse the City from complying with FIRREA. Moreover, it was appropriate for the FDIC, once it learned of the potential for a late claim, to ask for documentation concerning the potential claim so that it could determine whether the exception for late claims applied. Once the FDIC determined that the exception did not apply, it was entitled to disallow the claims.

■ Third, the City argues that it could not have filed a proof of claim for unpaid taxes until tax returns were filed, and it points out that the FDIC either did not file returns until after the bar dates or it did not do so at all. (*See* City Mem. at 16–19). This argument certainly gives me pause, for, as the City maintains, it is difficult for a taxing authority to assess taxes without a return. In the end, however, the City's arguments must be rejected, for at least three reasons.

First, taxes *can* be determined and assessed without a return. Indeed, New York City's Administrative Code (the "Code") authorizes the City to estimate a taxpayer's liability if no return is filed. *See* N.Y.C. Admin. Code § 11–672.1. As to Bank Tax, the City is permitted to assess it at any time, even if a return has not been filed. *See id.* § 11–674.3. If a taxpayer is liable for taxes, a lien arises automatically as of the original due date of the return for the taxable year, regardless of whether a return has been filed. *See id.* § 11–683.10. Moreover, the Code provides that interest on the non-payment or underpayment of taxes begins to run from the time that a return is originally due, regardless of when the return is actually filed. *See id.* § 11–675.1. These Code provisions demonstrate that the accrual of tax liability is not contingent upon the filing of a tax return.[9]

Second, the City was notified of the bank closings and the bar dates. The City should have filed timely, protective proofs of claim, even if no returns had been filed. In fact, the City did so in one instance, as it prepared a proof of claim with respect to Goldome for taxes allegedly owed, less than three months after the FDIC was

9. The City's argument that the tax claims at issue did not accrue until the FDIC actually filed tax returns confuses two distinct concepts—accrual and quantification. While it is true that the City may not have known the exact amount of taxes allegedly owed by Freedom, Goldome, American, and First New York when the FDIC was appointed receiver, it is not the case that tax liability had not accrued as of that date. The City is empowered by the Code to estimate taxes in the absence of a return. (*See* Boland Reply Dec. Ex. 2). The City does not ultimately disagree that tax liability accrues at the end of the taxable period as opposed to when a taxpayer actually files a tax return. The City concedes in its opposing memorandum that it can (and does) estimate taxes, but claims that it will do so "only as a last resort." (City Mem. at 16).

appointed receiver, and prior to when the FDIC filed Goldome's tax return. (Boland Reply Dec. ¶ 3 and Ex. 1). Although the City erroneously filed this claim in the Bankruptcy Court for the District of New Jersey, the filing demonstrates the City's ability to estimate tax liability even where no tax return has been filed. Likewise, the City was able to estimate Bank Tax liability against both American and First New York, and used those estimates to prepare claims before returns were filed. (*See* Frankel American Aff. ¶ 3 and Ex. 29; Frankel First New York Aff. ¶¶ 5, 7 and Ex. 3).[10] The City has both the power and ability to estimate tax liability prior to the filing of a tax return. The City also has the power to file a protective proof of claim in circumstances such as those presented here, where the City was specifically notified of each bank's closing and was advised that it had to file any claims against the bank by a certain date. For whatever reason, the City failed to do so with respect to three of the four claims.

Finally, Congress intended for FIR-REA's claims review process to provide a "streamlined method for resolving most claims against failed financial institutions in a prompt, orderly fashion, without lengthy litigation." *Marquis v. FDIC*, 965 F.2d 1148, 1152 (1st Cir.1992) (citing H.R.Rep. No. 101–54(I), 101st Cong., 1st Sess., at 418–19, *reprinted in* 1989 U.S.C.A.A.N. 86, 214–15). This scheme for the "prompt" and "orderly" resolution of claims would be disrupted if creditors could ignore, even for legitimate reasons, bar dates as to which they had actual notice. The late submission of substantial claims, even meritorious ones, and the failure to expeditiously seek judicial review of disallowed claims undermine the FDIC's ability to carry out Congress's desire to

"deal expeditiously with failed depository institutions."

Accordingly, the City's arguments are rejected.

### CONCLUSION

For the reasons stated herein, the motions to dismiss these related cases are granted and the complaints in all four actions are hereby dismissed with prejudice. The Clerk of the Court shall enter judgment accordingly.

SO ORDERED.

---

**10.** During discovery, a City administrative tax auditor for the Bankruptcy and Utility Tax Unit stated that:

When the Bankruptcy Tax Unit becomes aware of [a] bankruptcy filing ... we research the City's records to verify the tax standing of the taxpayer and to ascertain whether any taxes are outstanding. On the basis of prior history, we issue a claim to protect the City's interest.

(Boland Reply Dec. Ex. 2 (Miller Dep. at 5–6)).